PER CURIAM:
In this equal protection case, Darrin Lewis appeals from a grant of summary judgment in favor of the Ascension Parish School Board in Louisiana. The district court rejected Lewis’s claim that the School Board’s student assignment plan, formulated to address school population changes while “maintaining the district’s unitary status,” was impermissibly race-based and discriminatory against minority elementary, middle, and high school students zoned for East Ascension High School. We affirm in part, reverse in part and remand. Under the state of this record, we cannot determine whether the district’s plan must be subjected to strict or rational basis scrutiny. Further factual development is required.

Background

The Ascension Parish School District operates four high schools in Southeast Louisiana — Donaldsonville High School on the west bank of the Mississippi River,[1] and East Ascension High School, Dutchtown High School, and St. Amant High School on the east bank. Since at least’ 1972, the District has assigned students to these schools through an attendance-zone-based “feeder plan,” whereby specified elementary schools “feed” into specified middle schools, which in turn “feed” into one of the high schools. This organization allows students to matriculate together to middle school and high school.
In 2004, a federal district court dismissed the District’s longstanding desegregation case and declared the District unitary after finding that all vestiges of the prior compulsory dual school system had been eliminated to the extent practicable.[2] The District was thereafter able to assign students within the school district as necessary pursuant to its authority under Louisiana Revised Statute § 17:81, but the District maintained its pre-unitary status feeder plan.
In 2006, the enrollment of Dutchtown Middle School, a Dutchtown High School feeder school, rose to over 1,000 students and caused severe overcrowding. No other East Bank middle school had more than 730 students enrolled. Consequently, the District’s “Growth Impact Committee” was charged with developing a plan that would “address the growth with minimal impact on residents;” “ensure equal facilities and instructional quality for all children;” “attain enrollment máximums” established for the elementary, middle, and high school levels; and “maintain unitary status.” Superintendent Donald Songy and district staff also began exploring various re-zoning options. According to Superintendent Songy, the District sought to move approximately 450 students from Dutchtown Middle School, and thus out of Dutchtown High School’s feeder zone, to other East Bank schools with capacity for growth.
*345 Scott Duplechein, the “demographics application specialist” with the District’s Construction and Planning Department, originally prepared three alternative plans — Options 1, 2, and 3 — using enrollment data from the District’s “Edulog” software. According to Superintendent Songy, Edulog was used to “geographically code all students actually enrolled in the school system based on their physical residential addresses and to project the statistical effects of various rezoning options.” From input during public hearings held by the Growth Impact Committee, the District also considered Options 2c, 2d, 2e, 2f — variations on Option 2 — and a “Prairieville Option,”[3] all of which were formulated based upon Edulog data provided by Duplechein. Ultimately, the Ascension Parish School Board, which governs the District, narrowed its consideration down to Options 1, 2, 2f, and 3.
Summarizing Duplechein’s proposals, Superintendent Songy put together a document entitled “Statistical Analysis of Options 1, 2, 2f and 3” and presented it to the School Board for consideration. The document listed the current enrollment, percentage of African-American students, and percentage of at-risk students at each school in the district, then projected the enrollment, percentage of African-American students, and percentage of at-risk students at each school under each of the four options.[4] These data were generated from Edulog.
At its January 15, 2008 meeting, School Board member Troy Gautreau discussed the School Board’s redistricting efforts and, according to the meeting minutes, told the School Board and audience that “the criteria most concentrated on was [sic] maintaining our current unitary status with the Department of Justice and moving the least amount of kids as possible.” The School Board thereafter voted to adopt Option 2f. Option 2f moved Duplessis Primary from the Dutchtown feeder zone to the East Ascension feeder zone, assigned two brand new primary schools to each of the high school feeder zones, and re-drew attendance zones so that students from the Dutchtown feeder zone and the St. Amant feeder zone were moved to the East Ascension feeder zone.

Procedural History

Shortly after the adoption of Option 2f, Appellant Lewis, the father of two black schoolchildren assigned to East Ascension’s feeder zone both pre- and post-Option 2f, filed this suit against the Appellee School Board in Louisiana state court. Individually and on behalf of children “A” and “B,” Lewis brought, inter alia, a 42 U.S.C. § 1983 action for violations of his *346 children’s Fourteenth Amendment rights to equal protection.[5] Lewis claimed that the School Board’s “actions since the construction of Dutchtown High School[6] and in the adoption of Plan 2f were taken to ensure that East Ascension High School [and its feeder schools] would maintain a disproportionately large non-white minority population, leaving the remaining two East Bank schools as predominantly white.” He further alleged that, because Option 2f placed a disproportionate number of at-risk students[7] in the East Ascension feeder zone, Option 2f “would ensure that the non-white minority students at East Ascension High School [and in its feeder system] would not, now and in the future, be afforded educational opportunities equal to those available to the students at either Dutchtown High School or St. Amant High School.”[8] Lewis does not suggest that at-risk students are a suspect class for equal protection purposes. His claim is that minority students are being discriminated against based upon then-race by a disproportionate influx of at-risk students into their schools.
The School Board removed the action to federal court and filed a motion to dismiss or for summary judgment. Lewis responded but did not cross-move for summary judgment. The district court adopted the magistrate judge’s Report and Recommendation to grant the motion. Relevant to this appeal, the magistrate judge found that Lewis lacked standing to pursue claims on behalf of child A but did have standing as to child B. Further, the court found that, though Lewis’s § 1983 claims based upon Option 2f s implementation were timely, his claims based upon the 2002 modification of the District’s feeder plan[9] were prescribed. Finally, the court refused to apply strict scrutiny to the District’s adoption of Option 2f. The court found the plan facially race-neutral and that Lewis had not presented competent evidence of discriminatory motive by the School Board or disparate impact resulting from Option 2f. The magistrate judge determined that Option 2f satisfied rational basis review because the District had a legitimate government interest in alleviating school overcrowding. Lewis appeals.

*347
Standard of Review

The operative pleading was styled a “Motion to Dismiss and/or for Summary Judgment.” The district court considered evidence outside the pleadings in granting the School Board’s motion and treated it as a motion for summary judgment. “This court reviews the summary judgment de novo, applying the same standards as the district court.” DePree v. Saunders, 588 F.3d 282, 286 (5th Cir.2009) (citation omitted). Summary judgment is appropriate if “the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). “On review of a grant of summary judgment, all facts and inferences must be construed in the light most favorable to the non-movant.” E.E.O.C. v. Agro Distrib., LLC, 555 F.3d 462, 469 (5th Cir.2009) (citation omitted).

Discussion

We address each appealed issue — standing as to child A, prescription of Lewis’s claims based upon the 2002 feeder plan modification, and whether Option 2f violates the Fourteenth Amendment’s equal protection clause — in turn.

A. Standing

The magistrate judge held that Lewis lacked standing to pursue claims on behalf of child A because, while Lewis produced a judgment and letters of tutorship indicating that he was confirmed as child A’s natural tutor on June 2, 2009, he presented no evidence that he was child A’s tutor at the time suit was filed on March 14, 2008.
We note that child A indisputably has standing as the party affected by the alleged wrongful redistricting. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 571, 112 S.Ct. 2130, 2142 n. 5, 119 L.Ed.2d 351 (1992). The problem is that child A, as a minor, lacks capacity to sue under Article 683 of the Louisiana Code of Civil Procedure. La.Code Civ. Pro. 683 (“An unemancipated minor does not have the procedural capacity to sue.”). Unlike standing, the lack of which cannot be waived or cured, capacity to sue can be cured. Fed. Rule Civ. Pro. 17(c). See 6A Wright, Miller & Kane, Federal Practice and Procedure (2010) § 1570, at 676 (“Defects in the appointment of a guardian under Rule 17(c) are not jurisdictional ... especially when timely objection to the defective appointment would have permitted the mistake to be cured.”); Cf. Scott v. Jack’s Cookie Co., 413 So.2d 1334 (La. App.1982) (remanded to allow parent to cure capacity defect). Because we remand on other grounds, we vacate the district court’s ruling on this matter and remand for consideration by the district court in the first instance as to whether to permit Lewis to cure his defective allegations of capacity. No one disputes that Lewis has standing (and capacity) to pursue equal protection claims on behalf of child B.

B. Prescription of 2002 Feeder Plan Modification Claim

The magistrate judge found that Lewis’s equal protection claims based upon the School Board’s 2002 modification of its feeder plan were prescribed under the one-year statute of limitations applicable to § 1983 claims in Louisiana.[10] The court rejected Lewis’s “continuing violation” theory, noting the requirement that Lewis show a “series of related acts, one or more of which falls within the limitations period.” The court found that Lewis had presented no evidence that Option 2f, which *348 fell within the limitations period, was related to the 2002 modification of the District’s feeder system such that the latter claims survived prescription.
On appeal, Lewis has abandoned his continuing violation argument. Instead, he argues that he was not, nor should he have been, aware of the facts necessary to assert his claim based on the 2002 modification until public hearings were held in the summer or early fall of 2007. This argument is waived because it was not presented to the magistrate judge, see Cu-pit v. Whitley, 28 F.3d 532, 535 n. 5 (5th Cir.1994), and, alternatively, it fails on the merits. Lewis asserts that not until the 2007 hearings were data provided to the public regarding the 2002 modification’s allocation of minorities and at-risk students to the East Ascension feeder zone. Nothing in the record supports that proposition. The district court correctly held that the 2002 feeder plan modification claims are time-barred.

C. Option 2f Equal Protection Claim

To assess the constitutionality of the district’s Option 2f districting, one must first understand Lewis’s challenge to the plan. This opinion and the dissent agree that Lewis alleges minority students in the East Ascension feeder system were denied equal opportunity by the assignment of a disproportionate number of at-risk students to that system.[11] Such assignments allegedly resulted in a denial of equal educational opportunities to children in East Ascension comparable to those available in the Dutehtown or St. Amant high schools. Lewis also contends that Option 2f is automatically subject to strict scrutiny because it employs racial classifications and, alternatively, that he produced sufficient evidence that the Board had a discriminatory motive in assigning a disproportionate number of at-risk students to East Ascension, with corresponding evidence of disparate results.
In assessing Fourteenth Amendment equal protection challenges, the Supreme Court holds that “[a]ll racial classifications imposed by the government ‘must be analyzed by a reviewing court under strict scrutiny.’ ” Grutter v. Bollinger, 539 U.S. 306, 326, 123 S.Ct. 2325, 2337, 156 L.Ed.2d 304 (2003) (quoting Adarand, Constructors, Inc., v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995)). This is because a “racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.” Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) (citations omitted). Strict scrutiny also applies to government action that is “ostensibly neutral,” but only if the neutral law has a “disproportionately adverse effect” that “can be traced to a discriminatory purpose.” Id. at 272, 99 S.Ct. at 2292-93 (citations omitted).
If the government is found to have acted with a discriminatory purpose, strict scrutiny review places the burden on the government to prove that its actions are narrowly tailored to achieve a compelling government interest. See Gratz v. Bollinger, 539 U.S. 244, 270, 123 S.Ct. 2411, 2427, 156 L.Ed.2d 257 (2003). Absent a discriminatory purpose, its action is reviewed under the rational basis test.
.The magistrate judge here found that because Option 2f is “race-neutral” on its *349 face, the critical questions are (1) whether the school board intended to discriminate racially and (2) whether the plan had racially disparate effects. Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In this context, an allegation that the Board knew there would be a disproportionate impact in the re-zoning is “only relevant to the extent that it ‘reflects a discriminatory purpose.’ ” Ricketts v. City of Columbia, 36 F.3d 775, 781 (8th Cir.1994), (quoting Davis, 426 U.S. at 239, 96 S.Ct. 2040). A discriminatory purpose, however, requires more than a mere “awareness of consequences.” Feeney, 442 U.S. at 279, 99 S.Ct. at 2296.
Immediately following her recognition of these general principles, the magistrate judge referred to evidence in the record that the Board members and administrators all acted under the apprehension that “the reassignment option chosen could not upset the unitary status of those high schools.” The magistrate judge goes on:
Thus, it appears that, although the race of reassigned students was one of the factors considered when Option 2f was adopted, that factor was considered in an effort at maintaining the racial balance already existing among the schools in East Ascension Parish and in maintaining the school district’s unitary status, not as part of a racially discriminatory motive designed to allocate a ‘disproportionate number’ of African-American students to the East Ascension school zone. (Emphasis added).
The court accordingly rejected the application of strict scrutiny to Option 2f because it “does not explicitly employ racial classifications” and the plan assigns students to schools based on their “geographical location.”
We find the court’s analysis troubling for two reasons. First, it is unclear how, on the record before us, the court could make a factual finding as a matter of law about the Board’s lack of discriminatory purpose. Second, the court’s assumption that it might be justifiable to use racially-based decisions for the “benign” purpose of maintaining post-unitary “racial balance” among the schools in the system is at least in tension with the Supreme Court’s decision in Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007).[12] In Parents Involved, the Court required strict scrutiny review for a racially-based student assignment decision in a Kentucky school district that had been declared unitary. The Court held that preserving the district’s unitary status by means of racially-based assignments, albeit a “benign” racial motive, was nevertheless constitutionally impermissible. Parents Involved, 551 U.S. at 721, 127 S.Ct. at 2752. We need not parse Parents Involved further here, as we conclude that the following evidence created a genuine issue of material fact whether the Board acted with a racially discriminatory motive.
*350 Superintendent Songy compiled, and the School Board considered, documentation detailing the percentage of black students that would be enrolled at each East Bank school under Option 2f. The data were generated from software that coded each enrolled student in order to predict the “statistical effects” of Option 2f s boundary adjustments. Indeed, it is unclear how a student assignment plan could calculate the percentage of black students at each school without classifying individual students by race. The School Board insists that the Statistical Analysis underlying Option 2f — submitted by Lewis in opposition to summary judgment — does not constitute Option 2f itself. But to accept that self-serving, summary allegation would be to allow a school district to skew reality simply by selectively including documents in the record and labeling only those documents its “plan.”[13] We decline to so elevate form over substance, especially where we are obliged to construe all facts in the light most favorable to Lewis and reject conclusory allegations in support of a motion for summary judgment. See Brock v. Chevron U.S.A., Inc., 976 F.2d 969, 970 (5th Cir.1992).
The following testimony also suggests that the District relied upon the race of the individual students residing in different geographic locations when it re-zoned its schools:
1.Deposition of Superintendent Donald Songy — “We had to make sure that in doing this, we did not, by this move, increase the minority, the black percentage at East Ascension High School ... in all the plans we developed, we made sure that the move of the students did not increase that percentage.”
2. Deposition of School Board Member Ed Price — “[Ojur demographer started looking at the numbers, we wanted to see how we could best relieve overcrowding at Dutchtown High School and, of course, we looked at the majority and the minorities and see where we could best pull kids away in order to achieve that without basically upsetting the populace to where we could put more, you know, minority kids and majority kids and things like that.”
3. Deposition of School Board Member Jody Elisar — “... when Troy [Gautreau] came up to me, he said, well, what about if we go south of I — 10 into the Pelican Point area. I said, Troy, I understand we’re trying to get numbers that are sending white people to East Ascension because that’s what he wanted to talk about .... He said, well, can I just run the numbers with Scott [Duplechein]. I said, absolutely. But I knew in Pelican Point that there were a lot of African-Americans
4. Deposition of School Board Member Catherine Davis — “Q: ... the percentage of black[s] ... at certain schools? Was that an issue? ... A: Had to be because there were different plans. Q: So that was really the only difference between the plans, really, was the percentages of — A: Well, that would make up the plans, right? Q: Right. It was where *351 these minorities were going ... correct? A: The plan showed where students went. Q: And those students had labels attached to them such as — A: Unfortunately, yes.”
5. Deposition of School Board Member Harold Jarreau — “Q: Now, you said it’s important for you to see the black, white minority ratios, yes? A: You have to try and— you have to try and consider those numbers when you make the move, yeah.”
In addition to the referenced deposition testimony and affidavits from the Superintendent and School Board members, the record contains an excerpt from the District’s website, posted on November 9, 2007, but later removed, to provide the public with re-districting information. In it, the School Board indicated that “Students who are currently in the Dutchtown High School feeder line may be bused to the East Ascension High School feeder line to alter the racial balance .... We are simply trying to balance the demographics] of East Ascension.”
Notwithstanding this body of evidence, the magistrate judge found that “only” 339 students, in a district population of 18,000, were affected by Option 2f. In light of the testimony, this seems to be a group identifiable and identified principally on racial grounds (whether minority or not) for assignment to particular schools.
There are also material questions whether strict scrutiny must apply because evidence viewed in the light most favorable to Lewis supports Lewis’s contention that Option 2f was discriminatory in effect.
The magistrate judge determined that Option 2f neither has nor will result in a disparate impact on the basis of race. The court’s findings were based on a statistical analysis of Option 2f s impact on the three East Bank high schools.[14] Lewis, however, also alleges a disparate impact upon the East Ascension feeder system. The evidence shows that Option 2f effected an increase from 46% to 49% in the East Ascension feeder system’s percentage of the total number of minority students in the District, while the Dutchtown feeder system’s percentage decreased from 37% to 33%, and the St. Amant feeder system’s percentage remained at 18%. The East Ascension feeder system’s percentage of the total number of at-risk students in the District rose from 40% to 43%, while the Dutchtown feeder system’s percentage decreased from 27% to 25%, and the St. Amant feeder system’s percentage re *352 mained at 32%. These effects occurred even though only 29% of the East Bank student population was enrolled in the East Ascension feeder system, compared to 37% in the Dutchtown feeder system and 34% in the St. Amant feeder system.
Importantly, the only school that Option 2f realigned to a different feeder zone, Duplessis Primary, was projected to shift from 38% at-risk in the 2007-08 school year to 43% at-risk in the 2008-09 school year, thereby becoming a Title I-designated school.[15] Option 2f moved Duplessis Primary from Dutchtown’s feeder zone to East Ascension’s feeder zone, thereby ensuring that all of the schools in the East Ascension feeder zone would continue to be Title I-designated and that none of the schools in Dutchtown’s feeder zone would be so designated. These statistics provide some support for Lewis’s contention that Option 2f disproportionately funneled minorities and at-risk students into the East Ascension feeder zone, thereby discriminating against minorities whose educational environments suffer from disadvantages allegedly attributable to high levels of at-risk children.
Because factual questions exist as to whether Option 2f had both a racially discriminatory motive and a disparate impact, and the court misapprehended the significance of the evidence before it, the court erred in awarding summary judgment under a rational basis test.

Conclusion

No doubt the district had a responsibility to address overcrowding in Dutchtown High School. It could not, however, do so by assigning individual students among the schools based upon disadvantaging one race over another in the assignment of at-risk students, even if the motive in doing so -is the “benign” motive of “maintaining unitary status.” The standard of review, whether strict scrutiny or rational basis, turns on the factual questions of discriminatory motive and impact. Therefore, the judgment of the district court is AFFIRMED insofar as it found Lewis’s claim against the. 2002 Feeder Modification plan barred by prescription; otherwise, the judgment, including its denial of “standing” for Lewis as to Child A, is REVERSED and REMANDED, AFFIRMED in PART, REVERSED and REMANDED in PART, for further proceedings.
EDITH H. JONES, Chief Judge, concurring:
While I concur in the majority opinion, I believe that Appellant Lewis pursues an additional equal protection claim that we must consider. He challenges the school district’s racial gerrymandering of attendance zones to maintain almost the exact racial balance that prevailed in the schools before the district was declared unitary. Indeed, the district court seems to have accepted that this “benign” motive for racial assignments is legally acceptable because the district judge evaluated it on the standard of rational basis review. Without expressing an opinion on what a fully developed evidentiary record might show, I believe we ought to confirm that race-based student assignments undertaken “to preserve unitary status,” like other racially motivated government actions, presumptively violate the equal protection clause. Then we must remand this issue for trial.

A. Lewis preserved the “racial gerrymandering” argument.

My colleagues limit Lewis’s claim to that portrayed in the majority opinion, a claim *353 contesting the disproportionate assignment of at-risk students to the East Ascension feeder system by means of race-conscious redistricting. But Lewis also clearly asserted that, by itself, “race was a factor in the creation of the new high school districts.” That is, he contended that race-based zoning, even if “facially neutral” and independent of its effects, is unconstitutional. His brief states the issue “whether the District court erred in ... concluding ... despite competent evidence presented ... that race was a factor, that Defendant did not have the requisite intent and that a disproportionate impact did not occur .... ” Lewis asserted that the Board’s “actions since ... the adoption of Plan 2f were taken to ensure that East Ascension High School [and its feeder system] would maintain a disproportionately large nonwhite minority population, leaving the remaining two East Bank schools as predominantly white.”
I disagree that vague statements made at oral argument waived this claim. Judge King’s opinion asserts, for example, that waiver arises from the assertion that Lewis’s claim does not rest on “the number/percentage of minority students being transferred [to] East Ascension,” and the district court “incorrectly assumed that Plaintiff based his cause of action on an increase in the minority population at EAHS.” Statements like these simply clarify, correctly, that the appellant does not believe a magic number or percentage of minority students is per se violative of equal protection. What matters is the government’s intentional use of racial classifications. Lewis states flatly later in his reply brief that “the actions of racial balancing by the [District] are unconstitutional.” This is an issue we cannot avoid.
Finally, it seems to me conclusive that the District’s brief describes at length why, in its view, Lewis’s claim is not governed by the Parents Involved decision of the Supreme Court. The interpretation of Parents Involved is the crux of Lewis’s contention that the racial balancing of the feeder school lines serving East Ascension is unconstitutional. This is an issue we cannot avoid.

B. It is unconstitutional to engage in “racial balancing” in post-unitary status schools for the purpose of maintaining pre-unitary status ratios of minority and non-minority students.

I preface these comments with a disclaimer that we do not know, at this stage of litigation, that the Board members and administrators who testified that they were concerned with preserving the district’s unitary status actually revised the district lines in a racially conscious way to maintain pre-unitary percentages of minority and non-minority students in the schools. We know, however, that such a racial balance was the outcome of the process. A trial on the merits would determine the degree of correspondence between the Board’s intent and the result achieved.
The essential problem with the Board’s argument is the contention, shared by the magistrate judge and the district court, that maintaining the “racial balance” extant when unitary status was declared is NOT an unconstitutional use of race and thus may be analyzed under the rational basis standard for equal protection claims. A further problem is the misperception that when the desired racial balance is achieved by geographical lines, rather than assignment of specific students of certain races, the action is “facially neutral” and thus also subject to no more than rational basis scrutiny. These errors must be corrected.
*354 In Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007), the Supreme Court required strict scrutiny review of a race-based student assignment decision in a Kentucky school district that had been declared unitary. The Court held that the district’s unitary status conferred no discretion, much less an obligation, on the district to continue to assign individual students based on racial criteria. Id. at 721, 127 S.Ct. at 2752. It seems clear following Parents Involved that, if the Board deliberately aimed at racial balancing as a device to maintain unitary status, this motivation must be tested under strict scrutiny.
The Board distinguishes Parents Involved on three bases. First, it relies on cases which all predate Parents Involved, (see n.12 supra in majority opinion), and principally analogizes to Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71 (1st Cir.2004). In Anderson, however, the post-unitary district plan removed any racial consideration in school attendance in favor of a 100% “walk zone” preference and adhered to racial diversity merely as a desideratum. Fortuitously, the district’s entirely race-neutral plan was estimated to result in approximately the same population diversity in the schools as had existed in a race-conscious, and unconstitutional, Old Plan. Anderson, 375 F.3d at 85. The Anderson court found the New Plan facially race-neutral for these reasons, noting that it would not “hesitate to apply strict scrutiny review” if the plan had employed “racial classifications for the distribution of benefits .... ” Id.
Here, in contrast to Anderson, it is arguable that the Ascension Parish district required its statisticians to draft attendance zone boundaries that would preserve a precise racial balance among the high schools. The boundaries are only race-neutral because streets are not people. Streets, though, may well be racial proxies because the district or its agents apparently knew and used the racial composition of the people living on those streets to pursue racial balancing.
Appellee next distinguishes Parents Involved as involving only individual student assignments. The magistrate judge concurs: “By contrast, Option 2f, on its face, does not indicate that Dutchtown students were reassigned to the East Ascension school zone based upon their race. Instead, the reassignment was based upon the geographical location of their residences.” That the boundaries are “facially race-neutral,” however, does not necessarily insulate them from strict scrutiny review. In cases challenging legislative redistricting, the use of racial data to formulate districts can evidence discrimination. See, e.g., Bush v. Vera, 517 U.S. 952, 968, 116 S.Ct. 1941, 1953, 1958, 135 L.Ed.2d 248 (1996). To allow a school district to use geography as a virtually admitted proxy for race, and then claim that strict scrutiny is inapplicable because “Option 2f designated geographical lines for student assignment with no mention of race” is inconsistent with the Supreme Court’s holdings. See also Hunt v. Cromartie, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). Moreover, the Court has condemned racial balancing, however accomplished, when it is undertaken “to assure ... some specified percentage of a particular group merely because of its race or ethnic origin.” Grutter v. Bollinger, 539 U.S. 306, 329-30, 123 S.Ct. 2325, 2339, 156 L.Ed.2d 304 (2003) (quoting Regents of U. of Cal. v. Bakke, 438 U.S. 265, 307, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.)).
The third, and most plausible, ground for distinguishing Parents Involved is that Justice Kennedy, who provided the fifth *355 vote for the judgment, refused to accept the plurality opinion’s rejection of all race-based classifications and noted instead that school boards may pursue
the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods .... These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. See Bush v. Vera....
551 U.S. at 789, 127 S.Ct. at 2792 (Kennedy, J., concurring) (internal quotation omitted). As one commentator put it, Justice Kennedy’s controlling opinion approves the possibility of a school board’s adopting generic measures to increase racial diversity in primary and secondary schools. Michelle Renee Shamblin, Silencing Chicken Little: Options for School Districts After Parents Involved, 69 La. L.Rev. 219 (2008).
That Justice Kennedy adopted a middle-ground position does not render irrelevant the factual issue raised here. The Justice suggests strict scrutiny review would be “unlikely” if a school board adopts race-conscious boundary lines in order to support diverse K-12 student populations. Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007). But the district here does not argue that its re-zoning decisions had anything to do with an interest in fostering diversity as envisioned by Justice Kennedy. He also cites a plurality statement in Bush v. Vera expressing the view that, because electoral district lines are “facially neutral,” a “searching inquiry” is required to determine whether strict scrutiny governs constitutional review. Id.[1] These distinctions, plus his dichotomy between “general” race-conscious measures and individual racial stereotyping of students, emphasize the fact-intensive nature of the inquiry that must be made here. Compare, Friends of Lake View Sch. Dist. v. Beebe, 578 F.3d 753, 761 (8th Cir.2009) (facially neutral school closing statute judged by rational basis in absence of any allegations of racial motive).
Perhaps most pertinent to this case, Justice Kennedy’s concurrence adopts the clear statement in Parents Involved that once a school district formerly under a desegregation decree has been declared unitary, “[a]ny continued use of race must be justified on some other basis,” 551 U.S. at 721, 127 S.Ct. at 2752. If the Ascension Parish Board used geographic lines as a proxy for racial balancing to “maintain unitary status,” the plan is explicitly race-based, and the Board’s actions fly in the face of Parents Involved and require strict scrutiny review.
For these reasons, I would vacate the district court’s decision and remand for a trial to determine whether the Board’s redistricting effected racial balancing impermissible under strict scrutiny review, even if it occurred for the “benign” but wholly misguided purpose of maintaining the district’s unitary status.

. Student assignments to Donaldsonville High School are not at issue in this appeal.

. See Charles v. Ascension Parish Sch. Bd., Civil Action No. 65-3257 (M.D.La.).

. School Board member and Growth Impact Committee chairman Troy Gautreau gave a PowerPoint presentation to members of the public some time in 2007, detailing a "Duplessis Feeder Option” and a "Prairieville Feeder Option.” According to Superintendent Songy, the "Duplessis Feeder Option" referred to Option 2 and the “Prairieville Feeder Option” referred to Option 3. Later, the District simultaneously considered both a "Prairieville Option” and an "Option 3,” so it appears that Gautreau’s “Prairieville Feeder Option” and the subsequently-considered “Prairieville Option” refer to two different plans.

. Before narrowing its options to 1, 2, 2f, and 3, the District had similarly compiled a document listing the projected minority and at-risk student percentages in each feeder zone under Options 2c, 2d, 2e, 2f, 3, and the Prairie-ville Option. Gautreau's presentation of the Duplessis and Prairieville Options (i.e., original Options 2 and 3), which emphasized "[m]aintain[ing] our Unitary Status with the Department of Justice,” also compared each plan’s projected effect on the percentages of black and white students and the percentages of at-risk students who would attend each affected school.

. Lewis’s real property value diminution, Voting Rights Act, First Amendment free association, Title IX, and state law tort claims are not at issue in this appeal.

. Before Option 2f, the feeder plan was last modified in 2002, when Dutchtown High School opened to address population growth in the Dutchtown area of East Ascension Parish.

. “At-risk” students are those who are eligible for free or reduced-price lunch due to disadvantaged socioeconomic status.

. Lewis supports this claim with evidence that children who attend schools with high levels of low income students are at risk of low achievement regardless of their academic potential. As confirmation, he points to the School Performance Score data of each of the three feeder systems and notes that the schools in East Ascension's feeder zone, whose student populations have the highest levels of at-risk students, consistently score much lower than the schools in St. Amant's and Dutchtown’s feeder zones. The magistrate judge dismissed these data as covering the years 2000-2007, but pre-Option 2f evidence that schools with high percentages of at-risk students suffered academically is relevant to the contention that Lewis’s children will be damaged as a result of Option 2f’s concentration of at-risk students in the East Ascension feeder zone. We need not and do not here find that higher percentages of at-risk students negatively impact the learning experience of the remaining students or the school environment as a whole. We recognize that there are high-achieving low-income students and low-achieving high-income students. We conclude only that Lewis has so stated and provided a plausible basis for considering this claim.

. Supra, n. 6.

. See Bourdais v. New Orleans City, 485 F.3d 294, 298 (5th Cir.2007).

. Chief Judge Jones's special concurrence contends that Lewis has also maintained a claim for "racial balancing” of the attendance zones based on the district's intent to preserve the same "demographics” in each feeder system that existed when the district was declared unitary. The other panel members disagree that this argument is preserved.

. To support its conclusion, the court actually relies on cases that all predate the Parents Involved decision. Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71 (1st Cir.2004). See also McDaniel v. Barresi, 402 U.S. 39, 41, 91 S.Ct. 1287, 1288, 28 L.Ed.2d 582 (1971); Tometz v. Bd. of Ed. Waukegan City Sch. Dist. No. 61, 39 Ill.2d 593, 597-98, 237 N.E.2d 498, 501 (1968); Offermann v. Nitkowski, 378 F.2d 22, 24 (2d Cir.1967); Deal v. Cincinnati Bd. of Ed., 11 Ohio Misc. 184, 369 F.2d 55, 61 (6th Cir.1966); Springfield Sch. Comm. v. Barksdale, 348 F.2d 261, 266 (1st Cir.1965); Penn. Human Relations Comm’n v. Chester Sch. Dist., 427 Pa. 157, 164, 233 A.2d 290, 294 (1967); Booker v. Bd. of Ed. of Plainfield, Union Cty., 45 N.J. 161, 170-71, 212 A.2d 1, 6 (1965); Jackson v. Pasadena City Sch. Dist., 59 Cal.2d 876, 881-82, 31 Cal.Rptr. 606, 382 P.2d 878, 881-82 (1963).

. That is precisely what the District has done here. The School Board states that "Option 2f consists of a flow chart setting out the feeder plan, a set of written descriptions of the attendance zone lines by street boundaries, and a set of maps showing the geographical boundaries of the attendance zones” and directs this court to the School Board's record exhibit K, which conveniently excludes the document displaying the statistical analysis of Option 2f.

. After Option 2f's implementation, during the 2008-09 school year, East Ascension High School shifted from 41% minority students to 42.2% (and from 34.9% black students to 33.9%), Dutchtown High School shifted from 23.3% minority students to 24.1% (and from 19.6% black students to 20.1%), and St. Am-ant High School shifted from 11.9% minority students to 14.1% (and from 10.3% black students to 12.6%). Thus, Option 2f effected approximately a 1 to 3 percentage increase in minority population at each of the three high schools, with the largest percentage increase at St. Amant, and a decrease in the percentage of black students at East Ascension. As before Option 2f, East Ascension continued to have approximately twice the percentage of minority students as Dutchtown and three times the percentage of minority students as St. Amant. These percentages seem to reflect the success of the Board's effort to maintain each school’s pre-existing racial balance.
After Option 2f, East Ascension High School shifted from 40% at-risk students to 44%, Dutchtown High School shifted from 18% at-risk students to 20%, and St. Amant High School shifted from 24% at-risk students to 28%, a 2 to 4 percentage increase at each of the three schools with East Ascension and St. Amant experiencing the same percentage increase. As was the case before Option 2f, East Ascension continued to have slightly more than twice the percentage of at-risk students as Dutchtown and slightly less than twice the percentage of at-risk students as St. Amant.

. Schools with a Title I designation are those in which low-income children (i.e"at-risk”) make up at least 40% of the enrollment. These schools are eligible for certain federal funds.

. One goal of Option 2f, eliminating overcrowding in the Dutchtown feeder system, is race-neutral, but the law “does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).