# SUPREME COURT OF THE UNITED STATES

BOSTON PARENT COALITION FOR ACADEMIC
EXCELLENCE CORP. *v.* THE SCHOOL COMMITTEE
FOR THE CITY OF BOSTON, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 23–1137.   Decided December 9, 2024

The petition for a writ of certiorari is denied.

Statement of JUSTICE GORSUCH respecting the denial of certiorari.

A group of parents and students challenged a Boston public school admissions policy, arguing that it defied the Fourteenth Amendment's Equal Protection Clause.  After the First Circuit rejected the challenge and upheld Boston's policy, the parents and students sought review here.  In their petition for certiorari, they argue that the First Circuit misapplied *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181 (2023), and other of this Court's precedents.

The difficulty, as I see it, is that Boston has replaced the challenged admissions policy.  See 89 F. 4th 46, 54 (CA1 2023).  The parents and students do not challenge Boston's new policy, nor do they suggest that the city is simply biding its time, intent on reviving the old policy.  Strictly speaking, those developments may not moot this case.  But, to my mind, they greatly diminish the need for our review.  As a result, I concur in the Court's denial of the petition for certiorari.

Our decision today, however, should not be misconstrued.  A "denial of certiorari does not signify that the Court necessarily agrees with the decision (much less the opinion) below." *Kennedy* v. *Bremerton School Dist.*, 586 U. S. 1130 (2019) (ALITO, J., statement respecting denial of certiorari).

And, in fact, JUSTICE ALITO expresses today a number of significant concerns about the First Circuit's analysis, concerns I share and lower courts facing future similar cases would do well to consider. See *post*, at 3–5 (opinion dissenting from denial of certiorari).

# SUPREME COURT OF THE UNITED STATES

BOSTON PARENT COALITION FOR ACADEMIC
EXCELLENCE CORP. *v.* THE SCHOOL COMMITTEE
FOR THE CITY OF BOSTON, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 23–1137.　Decided December 9, 2024

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting from the denial of certiorari.

The following events might sound familiar. See *Coalition for TJ* v. *Fairfax Cty. School Bd.*, 601 U. S. \_\_\_ (2024) (ALITO, J., dissenting from denial of certiorari).

Boston is home to three "exam schools," which are ranked among the top public high schools in the United States. For 20 years, an applicant's GPA, standardized test score, and school preference were the sole metrics for admission to those schools. In 2019, however, the Boston School Committee (Committee) began to consider changes to the schools' admission practices for the purpose of altering their "racial/ethnic demographics." 89 F. 4th 46, 52 (CA1 2023). To that end, the Committee convened a working group to recommend revised procedures for the 2021–2022 application cycle.

After studying the issue, the working group presented a two-step proposal to the Committee in October 2020. First, students with the highest GPAs citywide would fill 20% of the exam-school seats. Second, each zip code in Boston would receive a share of the remaining 80% of seats proportionate to its population of school-age children. For those seats, the plan would rank applicants by GPA within each zip code and give assignment priority to zip codes with lower median household incomes. After the working group presented this proposal, Committee member Dr. Lorna Rivera expressed her approval. She emphasized that the

Committee must "be explicit about racial equity" and "in-creas[ing] those admissions rates, especially for Latinx and black students." Record 433–434.

Heeding Dr. Rivera's call, the Committee put race front and center when it came time to vote on the proposal several weeks later. The meeting kicked off with a lengthy statement from "anti-racist activist" Dr. Ibram X. Kendi, who "urge[d the Committee] to approve this antiracist policy proposal" that would "close racial and economic gaps." *Id.*, at 567, 647. Later, during the public-comment period, the Committee called on three citizens whose names suggested they were of Asian descent. Forgetting to mute himself on Zoom, the Committee Chairperson, Michael Loconto, mocked their names. See *id.*, at 892–893. Vice-Chairperson Alexandra Oliver-Dávila and Dr. Rivera could hardly contain their amusement, noting over text message they "almost laughed out loud" at Loconto's gaffe. *Id.*, at 2380.

That was not all Oliver-Dávila and Rivera had to say. As leaked text messages later revealed, Oliver-Dávila told Rivera that she expected "the white racists [to] start yelling [a]t us" during the public-comment period. *Id.*, at 2397. She went on to note that she "hate[s] WR," a reference to the predominantly white West Roxbury neighborhood of Boston. *Id.*, at 2401. Rivera agreed, stating she too was "[s]ick of westie whites." *Ibid.* Loconto, Oliver-Dávila, and Rivera voted to approve the working group's proposal, but they all later resigned as a result of their racist remarks.

The new policy worked as intended. Between the 2020–2021 and 2021–2022 school years, black students increased from 14% to 23%; Latino students increased from 21% to 23%; white students decreased from 40% to 31%; and Asian students decreased from 21% to 18%.

The Boston Parent Coalition (Coalition), an organization of parents and children who have or will apply to the exam schools, filed suit. The Coalition claimed the new admission

policy, though facially race neutral, violated the Equal Protection Clause.[1]

Except in extraordinary circumstances, intentional discrimination based on race or ethnicity violates that clause. See *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 220 (2023). But in this case, despite overwhelming direct evidence of intentional discrimination, the lower courts concluded that the Coalition's equal-protection claim failed because it did not show "disparate impact." The First Circuit reasoned that, even under the new policy, white and Asian students remained "stark[ly] over-represent[ed]" compared to their population levels. 89 F. 4th, at 58 (citing *Coalition for TJ* v. *Fairfax Cty. School Bd.*, 68 F. 4th 864, 881 (CA4 2023)).

This reasoning is indefensible twice over. First, the lower courts' disparate-impact analysis was clearly flawed. I addressed this point last Term in *Coalition for TJ*, 601 U. S. \_\_\_ (opinion dissenting from denial of certiorari). There, the Fourth Circuit concluded that a facially race-neutral admission policy caused no disparate impact on Asian students because they "were still overrepresented" compared to their population level. *Id.*, at \_\_\_ (slip op., at 7). As I

———————

[1] Boston later replaced the challenged 2021–2022 admission policy with a new policy that the Coalition does not challenge here. But, unlike respondents, I fail to see how that moots this case. First, the Coalition seeks nominal damages to redress the unconstitutional effects of the 2021–2022 admission policy. See Record 2103; *Uzuegbunam* v. *Preczewski*, 592 U. S. 279, 292 (2021). Second, the opportunity to reapply under the new policy does not foreclose equitable relief related to the 2021–2022 admission policy. Indeed, I see no reason why the District Court could not order equitable relief entirely independent of the new policy's requirements. For example, it could order the admission of the remaining students in the Coalition without any requirement for reapplication. Furthermore, if this case truly became moot on its way here, we would ordinarily vacate the judgment below. See *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950).

explained, that is a "patently incorrect and dangerous understanding" of disparate impact. *Id.*, at ___ (slip op., at 1). But we failed to stamp out the Fourth Circuit's error when we had the chance. Now, the error has metastasized and spread to the First Circuit. Nonetheless, it bears repeating that under our decision in *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977), all a party must show in order to rely on disparate impact as circumstantial evidence of discriminatory intent is that an admission policy reduced one racial group's chance of admission and increased another racial group's chance of admission.

Second, and worse yet, the lower courts mistakenly treated evidence of disparate impact as a necessary element of an equal-protection claim. To my knowledge, we have never said as much. To be sure, we have said disparate impact is "[p]ossible evidence" of such a claim, *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. 1, 34 (2020) (plurality opinion), and "may provide an important starting point," *Arlington Heights*, 429 U. S., at 266. We have also emphasized that disparate impact "is *not* the sole touchstone."[2] *Washington* v. *Davis*, 426 U. S. 229, 242 (1976) (emphasis added). Further, a rigid rule requiring disparate-impact evidence would make little sense. We would, of course, recognize an equal-protection violation if the government had a malicious "intent or purpose" to discriminate against an *individual* based on his or her race or ethnicity. *Arlington Heights*, 429 U. S., at 265. Proof that the government's action also injured *the racial or ethnic*

_____

[2] The Courts of Appeals appear to be divided on whether disparate impact is a necessary element of an *Arlington Heights* claim. Compare *Chinese Am. Citizens Alliance of Greater N. Y.* v. *Adams*, 116 F. 4th 161, 165 (CA2 2024), with *Lewis* v. *Ascension Parish School Bd.*, 806 F. 3d 344, 358–359 (CA5 2015); *Doe* v. *Lower Merion School Dist.*, 665 F. 3d 524, 549 (CA3 2011); and *Anderson* v. *Boston*, 375 F. 3d 71, 89 (CA1 2004).

*group* to which the plaintiff belongs, however, is not essential.

In making such an error, the First Circuit rendered legally irrelevant graphic direct evidence that Committee members harbored racial animus toward members of victimized racial groups.[3] As the Committee members made "explicit," they worked to decrease the number of white and Asian students at the exam schools in service of "racial equity." Record 433. That is racial balancing by another name and is undoubtedly unconstitutional.

\* \* \*

We have now twice refused to correct a glaring constitutional error that threatens to perpetuate race-based affirmative action in defiance of *Students for Fair Admissions*. I would reject root and branch this dangerously distorted view of disparate impact. The Court, however, fails to do so today, so I must respectfully dissent.

---

[3] The parties dispute whether Oliver-Dávila's and Rivera's leaked text messages are properly before us. That issue, however, is not an obstacle to our correction of the First Circuit's legal error. Moreover, I doubt the District Court was correct to exclude these later-discovered texts under Rule 60(b)(2) of the Federal Rules of Civil Procedure due to the Coalition's alleged lack of diligence in procuring them. Before the Coalition filed this action, one of its members submitted a public-records request for, among other things, text messages between Oliver-Dávila and Rivera during the meeting to vote on the proposal. The Boston Public Schools inexplicably omitted the racist texts in its response. The later revelation of the texts is thus an obvious basis for reconsideration.