# SUPREME COURT OF THE UNITED STATES

## COALITION FOR TJ *v.* FAIRFAX COUNTY SCHOOL BOARD

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 23–170.   Decided February 20, 2024

The petition for a writ of certiorari is denied.

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting from the denial of certiorari.

The Court of Appeals' decision in this case is based on a patently incorrect and dangerous understanding of what a plaintiff must show to prove intentional race discrimination. A group representing applicants for admission to a highly competitive public magnet school brought suit, claiming that changes in the school's admissions requirements violated the Equal Protection Clause. They alleged that the changes were made for the purpose of discriminating on the basis of race, to the detriment of Asian-American applicants. The District Court found that direct and circumstantial evidence supported that claim and issued an injunction against implementation of the changes. On appeal, however, a divided Fourth Circuit panel reversed and held that the plaintiff's claim failed simply because the challenged changes did not reduce the percentage of Asian-American admittees below the percentage of Asian-American students in the schools in the jurisdictions served by the magnet school. What the Fourth Circuit majority held, in essence, is that intentional racial discrimination is constitutional so long as it is not too severe. This reasoning is indefensible, and it cries out for correction.

# I

## A

Thomas Jefferson High School for Science and Technology (TJ), is a magnet school that draws students from Fairfax County and other jurisdictions in northern Virginia. Widely recognized as one of the best public high schools in the Nation,[1] the school has exceptional resources, including 13 on-campus research laboratories and a student-produced scientific research journal, and it features a rigorous curriculum. All students must study computer science and complete a science or technology research project, and the school offers 26 advanced placement and 20 "post-AP" courses.[2]

The Fairfax County School Board (Board), an elected 12-member body, sets the school's admissions policy. Until 2020, the school had a highly competitive race-blind admissions process that relied heavily on standardized tests. Eighth grade students were eligible to apply if they had at least a 3.0 GPA and had taken a course in algebra. All applicants then took three standardized tests, and after that, the highest ranked students took a fourth exam and submitted two teacher recommendations. The class was selected from that group based on a holistic review of these inputs. Admission to TJ has been very competitive. From 2012 to 2020, the admissions rate varied between 14 and 20 percent.[3]

––––––––––

[1] U. S. News & World Report, Thomas Jefferson High School for Science and Technology, https://www.usnews.com/education/best-high-schools/virginia/districts/fairfax-county-public-schools/thomas-jefferson-high-school-for-science-and-technology-20461.

[2] Thomas Jefferson High School for Science and Technology 2022–2023, https://tjhsst.fcps.edu/sites/default/files/media/inline-files/2022-23%20TJHSST%20Profile_0.pdf; Fairfax County Public Schools, School Summary, https://schoolprofiles.fcps.edu/schlprfl/f?p=108%3A50%3A%3A%3A%3A%3AP0_CURRENT _SCHOOL_ID%3A300.

[3] See, *e.g.*, TJHSST Admissions Statistics for Class of 2016, https://web.archive.org/web/20150404073947/ https://www.fcps.edu/cco/

In recent years, this race-neutral competitive process produced classes with a high percentage of Asian-American students. In 2019, Asian Americans constituted 71.5 percent of TJ's class, and the 2020 entering class was similar, with a 73 percent Asian-American student body.

Asian-American students, many of whom are immigrants or the children of immigrants,[4] have often seen admission to TJ as a ticket to the American dream. In this respect, their aspirations mirror those of young people from other immigrant groups. Public magnet schools with competitive admissions based on standardized tests have served as engines of social mobility by providing unique opportunities for minorities and the children of immigrants, and these students' subsequent careers have in turn richly contributed to our country's success. For example, one such school in New York City has produced no fewer than nine Nobel laureates.[5]

While Asian Americans have striven to attend TJ, their strong representation in the student body attracted criticism from education officials. In June 2020, TJ students received an email from their principal lamenting that the school did "'not reflect the racial composition in [the Fairfax County Public Schools].'" App. to Pet. for Cert. 90a. A member of the Board wrote in an email that she was "'angry

---

pr/tj/tjadmissions0412.pdf; Fairfax County Public Schools, TJHSST Offers Admission to 486 Students, https://web.archive.org/web/20220824023116/https://www.fcps.edu/news/tjhsst-offers-admission-486-students.

[4] The percentage of foreign-born residents in the jurisdictions in question is well above the national average. For example, immigrants make up approximately 30 percent of the population of Fairfax County, which is the most populous county in Virginia. And of the top five countries from which these immigrants came, four (India, Korea, Vietnam, and China) are in Asia. Fairfax County, Our Immigrant Neighbors, https://www.fairfaxcounty.gov/demographics/our-immigrant-neighbors.

[5] Bronx Science Foundation, Celebrating Bronx Science Luminaries, https://alumni.bxscience.edu/hall-of-fame-2.

and disappointed'" at TJ's admissions results and that she expected "'intentful [*sic*] action forthcoming.'" *Id.*, at 100a. That Board member also contacted Scott Braband, the superintendent of the Fairfax County Public Schools, demanding that the Board and the public school system "'be explicit in how we are going to address the underrepresentation of [b]lack and Hispanic students.'" *Ibid.*

The Board answered the call. In December 2020, it adopted the current admissions policy, which no longer relies on standardized tests. The policy fills around 450 of the 550 seats in each incoming class by allocating a specified number of seats to each public middle school in the qualifying region.[6] The remaining 100 seats are open to the entire applicant pool. Applicants for these seats are evaluated based on their grades, a "portrait sheet," a problem-solving essay, and "Experience Factors." The portrait sheet is meant to describe the applicant's "soft" skills (such as the ability to work with other students). The four "Experience Factors" are (1) eligibility for free or reduced price meals; (2) status as an English language learner; (3) eligibility for special education services; and (4) attendance at a public middle school that previously sent few students to TJ.

This new policy had an immediate effect. The percentage of white, Hispanic, and black students increased,[7] while the percentage and number of Asian-American students sharply dropped. In prior years, the offer rate for Asian-American students had hovered between 65 and 75 percent of the school's total offers. Under the new policy, Asian

---

[6] Specifically, the number of seats given to each such school is equal to 1.5 percent of the school's eighth grade population.

[7] White students received 22.36 percent of admission offers, up from 17.7 percent. Hispanic students received 11.27 percent of offers, up from 3.3 percent. Black students received 7.9 percent of offers, up from less than 3 percent. Parties' Stipulation of Uncontested Facts in No. 1:21–cv–296 (ED Va., Dec. 3, 2021), ECF Doc. 95, pp. 4–5; 2 App. in No. 22–1280 (CA4, May 11, 2022), ECF Doc. 44–2, pp. 96–98.

Americans received 54.36 percent of the offers. In fact, even though the entering class expanded by 64 seats, the number of seats offered to Asian Americans decreased by 56. *Id.*, at 89a.

## B

The Coalition for TJ (Coalition), an organization that includes parents of children who have applied or will apply to TJ, filed suit in Federal District Court under 42 U. S. C. §1983, against the Board. The Coalition alleged that the new admissions policy was based on intentional racial discrimination and therefore violates the Equal Protection Clause.

After a careful review of the record, the District Court agreed. It found that both direct and circumstantial evidence clearly showed that the changes in the admissions process were motivated by racial discrimination. The court found that the Board's decision-making process was "rushed, not transparent, and more concerned with simply doing something to alter the racial balance at TJ than with public engagement." App. to Pet. for Cert. 106a. "The discussion of TJ admissions changes was infected with talk of racial balancing from its inception," and "emails and text messages between Board members and high-ranking [Fairfax County Public School] officials leave no material dispute that, at least in part, the purpose of the Board's admissions overhaul was to change the racial makeup [of] TJ to the detriment of Asian-Americans." *Ibid.* The court also found that "Asian-American students [were] disproportionately harmed by the Board's decision to overhaul TJ admissions," *id.*, at 99a, and it viewed this disparate impact as circumstantial evidence of unlawful discrimination. Based on this view of the evidence, the court granted summary judgment for the Coalition and enjoined use of the new policy.

The Fourth Circuit reversed the District Court in a star-

tling 2 to 1 decision. 68 F. 4th 864 (2023). The panel majority held that the Coalition could not prevail because, as the majority saw things, the new policy "visit[ed] no racially disparate impact on Asian American students" since, even after use of the new policy began, Asian Americans still received 54.36 percent of the admissions offers. *Id.*, at 879–881. This percentage exceeded the percentage of Asian-American students in the applicant pool, and therefore, according to the panel majority's reasoning, Asian-American students had no cause to complain. As the panel majority put it, "an application of elementary arithmetic shows that Asian American students, as a class, experience no material disadvantage under the policy's functioning" and in fact perform "better in securing admission to TJ than students from any other racial or ethnic group." *Id.*, at 882. Although the panel also went on to discuss the Coalition's other evidence, the panel majority concluded that it "could end [its] analysis of the Coalition's Equal Protection Claim at th[at] juncture." *Id.*, at 879–880, 882. As I will explain below, the panel's "elementary arithmetic" was elementary error.

II

The "central purpose" of the Equal Protection Clause is to prohibit "official conduct discriminating on the basis of race." *Washington* v. *Davis*, 426 U. S. 229, 239 (1976); see also, *e.g.*, *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 206 (2023) (SFFA) (the "core purpose" of the Equal Protection Clause is "doing away with all governmentally imposed discrimination based on race" (internal quotation marks and alterations omitted)). When a party claims that a law or policy is racially discriminatory, that party must show that it was adopted for "a racially discriminatory purpose." *Davis*, 426 U. S., at 240. A facially discriminatory policy is automatically subject to heightened review. Even a policy that is

race neutral on its face may be unconstitutional if it is adopted for a "racially discriminatory intent or purpose." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 265–266 (1977). A party who challenges such a policy on equal protection grounds can show intentional discrimination by proffering a combination of direct and circumstantial evidence.

In *Arlington Heights*, we listed four factors that, among others, have a bearing on the assessment of circumstantial evidence: (1) the law's historical background, (2) the sequence of events leading to the law's enactment, including any departures from the normal legislative process, (3) the law's legislative history, and (4) whether the law "'bears more heavily on one race than another.'" *Id.*, at 265–269. We have emphasized that disparate impact, by itself, does not establish intentional discrimination. *Davis*, 426 U. S., at 239–240.

The District Court faithfully employed this framework. In addition to noting that the record contains direct evidence of racial intent, the court noted the stark change effected by the new policy, the unusual decisionmaking process that led to the change, and the fact that the change bore "more heavily on" Asian Americans than members of other groups.

The Fourth Circuit panel majority, by contrast, completely distorted the meaning of disparate impact. Even though the new policy bore "more heavily" on Asian-American applicants (because it diminished their chances of admission while improving the chances of every other racial group), the panel majority held that there was no disparate impact because they were still overrepresented in the TJ student body.

That is a clearly mistaken understanding of what it means for a law or policy to have a disparate effect on the members of a particular racial or ethnic group. Under the old policy, each Asian-American applicant had a certain

chance of admission. Under the new policy, that chance has been significantly reduced, while the chance of admission for members of other racial and ethnic groups has increased. Accordingly, the new admissions policy bore more heavily on Asian-American applicants.

The panel majority, however, thought that this did not matter. The simple fact that Asian Americans were still overrepresented in the TJ student body was enough to doom the Coalition's equal protection claim. As far as the Fourth Circuit was concerned, the Board could have adopted a policy designed solely to reduce the Asian-American offer rate and still evaded liability. The holding below effectively licenses official actors to discriminate against any racial group with impunity as long as that group continues to perform at a higher rate than other groups.

That is indefensible. As Judge Rushing explained in dissent, under the Fourth Circuit's view, the Constitution permits "facially neutral laws explicitly motivated by racial discrimination, as long as the law's negative effect on the targeted racial group pushes it no lower than other racial groups." 68 F. 4th, at 904. "It would not matter, for example, if a new law cut a racial group's success rate from 90% to 30% and the legislature was open about its discriminatory purpose, as long as no other racial group succeeded at a higher rate." *Ibid.* This rule defies law and logic.

Consider the following hypothetical case. Suppose that white parents in a school district where 85 percent of the students are white and 15 percent are black complain because 10 of the 12 players (83 percent) on the public high school basketball team are black. Suppose that the principal emails the coach and says: "You have too many black players. You need to replace some of them with white players." And suppose the coach emails back: "Ok. That will hurt the team, but if you insist, I'll do it." The coach then takes five of his black players aside and kicks them off the

team for some contrived—but facially neutral—reason. For instance, as cover, he might institute a policy that reserves a set number of spots on the roster for each of the middle schools who feed to the high school. According to the reasoning of the Fourth Circuit majority, this action would not violate equal protection because the percentage of black players left on the team (approximately 42 percent) would exceed the percentage of black students in the school.[8] I cannot imagine this Court's sustaining such discrimination, but in principle there is no difference between that imaginary case and one now before us.

## III

The Fourth Circuit's decision is based on a theory that is flagrantly wrong and should not be allowed to stand. I would not reach the question whether the District Court correctly analyzed all the evidence in this case, but I would summarily reject the holding discussed above. If the District Court's evaluation of the evidence is correct, the panel majority's fallacious reasoning works a grave injustice on diligent young people who yearn to make a better future for themselves, their families, and our society. In addition, the Fourth Circuit's reasoning is a virus that may spread if not promptly eliminated. Indeed, the First Circuit has already favorably cited the Fourth Circuit's analysis to disparage the use of a before-and-after comparison in a similar equal protection challenge to a facially neutral admissions policy. See *Boston Parent Coalition for Academic Excellence Corp.* v. *School Comm. for Boston*, 89 F. 4th 46, 57–58 (2023). And

---

[8] Should the Fourth Circuit's reasoning be adopted elsewhere, the same would also hold true in other circuits where the court of appeals considers disparate impact to be a necessary element of a successful challenge to a facially neutral policy. See *Lewis* v. *Ascension Parish School Bd.*, 806 F. 3d 344, 358–359 (CA5 2015); *Doe* v. *Lower Merion School Dist.*, 665 F. 3d 524, 549 (CA3 2011); *Anderson* v. *Boston*, 375 F. 3d 71, 89 (CA1 2004).

TJ's model itself has been trumpeted to potential replica-
tors as a blueprint for evading *SFFA*.[9]

*        *        *

   The Court's willingness to swallow the aberrant decision
below is hard to understand.  We should wipe the decision
off the books, and because the Court refuses to do so, I must
respectfully dissent.

_____

   [9] Less than two weeks after *SFFA* was decided, the dean of UC Berke-
ley School of Law and the general counsel for the University of Michigan,
to name just a couple of examples, openly advocated for schools to emu-
late TJ's new admissions model.  See Brief for Cato Institute as *Amicus
Curiae* 4–7.  Just as TJ offers a roadmap for other selective schools to
skirt the Equal Protection Clause, so too does the Fourth Circuit's rea-
soning offer a roadmap for other federal courts to provide cover.